UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BENTONVILLE SCHOOL DISTRICT                                      PLAINTIFF

v.                              No. 5:17-CV-05134

LISA SMITH, as parent of M.S., a minor                          DEFENDANT

## OPINION AND ORDER

Before the Court is Plaintiff Bentonville School District's ("BSD") complaint (Doc. 1)

seeking review of the findings and decision of the administrative hearing officer in a due process

hearing brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.

§ 1400, *et seq*. Defendant Lisa Smith filed an answer (Doc. 7). The parties filed an administrative

record (Docs. 26, 27), and BSD filed a supplemental record (Doc. 31) with leave of Court. BSD

then filed a posthearing brief (Doc. 34). Smith filed a response (Doc. 35). BSD filed a reply

(Doc. 36) to Smith's response. For the following reasons, the Court finds that the administrative

hearing officer erred in finding that BSD violated the substantive provisions of IDEA, reverses the

hearing officer's decision, and enters judgment on the pleadings in favor of BSD.

## I.       Standard of Review

The IDEA requires every local educational agency ("LEA") receiving federal funds to

implement policies "to ensure that children with disabilities and their parents are guaranteed

procedural safeguards with respect to the provision of a free appropriate public education by such

agenc[y]." *B.S. ex rel. K.S. v. Anoka Hennepin Pub. Schs.*, 799 F.3d 1217, 1219 (8th Cir. 2015)

(quoting 20 U.S.C. § 1415(a)). A party challenging whether an LEA provided a free appropriate

public education ("FAPE") has the right to file an administrative complaint and receive an

impartial due process hearing before a local or state agency. 20 U.S.C. § 1415(b)(6). The IDEA

also allows a party to seek review of the local or state due process hearing in a federal district court. 20 U.S.C. § 1415(i)(2)(A) & (3)(A). In reviewing a hearing officer's decision, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415.

In these actions, a district court serves a quasi-appellate function while remaining a court of original jurisdiction. *See Kirkpatrick v. Lenoir Cnty Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000) ("[W]hile a federal district court may review a state review officer's decision and even defer to that decision, the federal district court does not sit as an appellate court. Federal district courts are courts of limited, original jurisdiction with no power to sit as appellate tribunals over state court or administrative proceedings."); *Spiegler v. D.C.*, 866 F.2d 461, 465-66 (D.C. Cir. 1989) (holding that the quasi-appellate role of the district court in an action brought under the [IDEA] does not differ in important ways from an administrative appeal for purposes of borrowing an appropriate statute of limitations); *Adler by Adler v. Educ. Dep't of State of N.Y.*, 760 F.2d 454, 458-59 (2d Cir. 1985). The Eighth Circuit has explained a district court's duty in handling an IDEA claim:

> The district court must . . . review the administrative record, hear additional evidence if requested, and "basing its decision on the preponderance of the evidence, . . . grant such relief as [it] determines is appropriate." *Id.* at § 1415(i)(2)(C). In deciding whether the IDEA has been violated, the district court must "independently determine whether the child [in question] has received a FAPE." *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003), *cert. denied*, 540 U.S. 984, 124 S. Ct. 478, 157 L. Ed. 2d 375 (2003). In doing so, the court must also give "'due weight' to agency decision-making." *Id.* (quoting *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)). This somewhat "unusual" standard of review is less deferential than the substantial evidence standard commonly applied in federal administrative law. *Indep. Sch. Dist. No. 283*, 88 F.3d at 561. But we have recognized that this limited grant of deference—"due weight"—is appropriate in IDEA cases because the ALJ "had an opportunity to observe the demeanor of the witnesses and because a [district] court

should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s]." *CJN*, 323 F.3d at 636 (internal quotation marks and citation omitted).

*K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011).

## II. Facts

Lisa Smith, mother of M.S., brought an action under IDEA against BSD, alleging that M.S. was denied due process by BSD from the time he enrolled in the district's Early Childhood Center in January of 2008 until she filed her due process complaint on October 24, 2016. (Doc. 10-1, p. 6; Doc. 1, p. 3).

M.S. resides with his mother, father, and sisters. (Doc. 27-9, p. 199). In 2007, M.S.'s primary care physician referred him for a developmental evaluation from the Schmieding Developmental Center. (Doc. 27-9, p. 280). The Center determined M.S. met the criteria for anxiety disorder, mixed developmental disorder, and mixed receptive/expressive language disorder. (Doc. 27-9, p. 289). That same year, as a four-year-old, M.S. began preschool at BSD's Early Childhood Center ("ECC"). (Doc. 27-9, p. 183). On February 29, 2008, BSD evaluated M.S. to determine his eligibility for special education. (Doc. 27-9, p. 268). Examiner Tracy Ervin found that M.S. attained developmental milestones within age-appropriate expectations. (Doc. 27-9, p. 269). However, Ervin noted that M.S. was noncompliant and aggressive when he did not get his way. (*Id.*). Ultimately, Ervin determined that M.S. qualified for special education services and recommended M.S. receive developmental therapy for 45-60 minutes, once a week. (Doc. 27-9, p. 277).

Elizabeth Srader, M.S.'s preschool teacher at ECC, believed M.S. to be "a little behind." (Doc. 27-1, p. 40). She described M.S. as withdrawn and angry. (*Id.*). M.S. was placed on an Individualized Education Plan ("IEP") during the 2008-09 school year. (Doc. 27-1, p. 40). M.S.

received occupational and physical therapy for his developmental delays. (Doc. 27-1, p. 41). In February of 2009, Srader described M.S. as average for his age in meeting expected educational benchmarks. (Doc. 27-1, p. 44). However, ECC faculty and staff were concerned that M.S. presented hallmarks of autism. (Doc. 27-6, pp. 224-25).

On March 9, 2009, M.S.'s IEP team met for M.S.'s annual review. (Doc. 27-9, p. 183). The IEP team reviewed existing evaluation data, teacher reports, M.S.'s current IEP, and classroom-based assessment results. (*Id.* at 183-87). The team opted to extend M.S.'s existing IEP to June 4, 2009. (*Id.* at 183). During the existing data review, the team decided M.S. should undergo additional testing. (Doc. 27-9, p. 185).

On May 6, 2009, M.S.'s IEP team met again for an evaluation/programming conference. (Doc. 27-9, p. 189). The IEP team identified M.S.'s disability as "Non-Categorical Developmental Delay." (*Id.* at 189). The IEP team determined that occupational, physical, and developmental therapies were appropriate. (*Id.* at 190). At this meeting, the team also determined that Extended School Year Services were unnecessary for M.S. at that time. (*Id.* at 194).

On May 14, 2009, M.S.'s IEP team met for a transition conference at Apple Glen Elementary School. (Doc. 27-1, p. 50). The team determined M.S.'s evaluation data did not substantiate the existence of a disability consistent with state and federal regulations implementing IDEA. (Doc. 27-9, p. 199). The team also determined that M.S. qualified for occupational and physical therapy under a Section 504 plan. (Doc. 27-9, p. 200; Doc. 27-6, p. 237).

Before M.S. began his kindergarten year at Apple Glen Elementary, Smith reached out to Lisa St. John, principal at the school, to notify her that M.S. had been placed at Vista Health Therapeutic Day Treatment ("TDT") program. (Doc. 27-1, p. 96). Smith told St. John that "[M.S.] can't come to school. He will hurt someone. He is in a bad place and I need you to help me make

sure that he can stay there." (*Id.*; Doc. 27-1, p. 186). Apple Glen Elementary worked to honor Smith's wishes. Brad Reed, Director of Student Services for BSD, assisted Smith in placing M.S. at the TDT for his elementary school tenure. (Doc. 27-1, p. 97). M.S. stayed on Apple Glen's classroom roll and Apple Glen was responsible for completing an annual review of TDT services for M.S. (*Id.* at 98).

There are no academic records for M.S. at the TDT for kindergarten or first grade. (Doc. 27-1, p. 118). Second grade TDT academic records reflect that M.S. received failing grades in all academic courses for the Fall semester. (*Id.*). On May 2 and May 9, 2012, Carrie Cousins, special education lead and speech/language pathologist at Apple Glen, conducted an evaluation of M.S. while he was at the TDT. (Doc. 27-1, p. 147). Cousins's evaluation did not find the extreme or severe expressive/receptive language disorder diagnosed by the Schmieding Developmental Center in 2007. (Doc. 27-1, p. 152).

In second grade, Smith began asking BSD to place M.S. back at Apple Glen. (Doc. 27-1, p. 217). Cousins observed M.S. at the TDT and witnessed many of the behavioral issues previously noted about M.S., including withdrawal from the other students, work refusal, and aggressive behavior. (Doc. 27-1, p. 218). On September 29, 2011, a referral conference was held. (Doc. 27-9, p. 121). The IEP team opted to wait on an evaluation report from Lisa Fitzgibbons, a psychologist BSD used for special education evaluations, before deciding whether to place M.S. back in the public-school setting. (*Id.*). The Fitzgibbons report found that M.S.'s performance on a series of tasks was suggestive of Autism Spectrum Disorder. (Doc. 27-9, p. 233). Fitzgibbons diagnosed M.S. with Pervasive Developmental Disorder, not otherwise specified.[1] (*Id.*). On

---

[1] The Court takes judicial notice that the DSM-V, released in May of 2013, includes the condition "Autism Spectrum Disorder," which now encompasses the DSM-IV-TR's separate condition of "Pervasive Developmental Disorder." *See* American Psychology Association,

March 29, 2012, BSD received an official referral by Karrie Bradshaw, Assistant Principal and Special Education designee at Apple Glen Elementary School, to move M.S. from the TDT to public school. (Doc. 27-9, p. 123). Although Smith initially wanted M.S. to return to public school when the referral was made, she opted to leave M.S. at TDT. (Doc. 27-1, p. 234).

M.S. remained at the TDT until his third-grade year. On March 6, 2013, Kathy Herndon, BSD's elementary school special education coordinator, met with the TDT staff and Lisa Smith to discuss M.S.'s increased behavioral issues at the TDT and recent safety concerns TDT had with M.S. remaining at their facility. (Doc. 27-2, p. 167). At the meeting, all parties agreed that moving M.S. from the TDT to homebound education for 90 days was the best option for M.S. (Doc. 27-9, p. 112).

On November 13, 2013, M.S.'s IEP team met to discuss M.S.'s progress on homebound school work and determine the appropriate placement for M.S. when he returned to public school. (Doc. 27-9, p. 17). The team determined that M.S. would return to school at Old High Middle School in a behavior classroom for 360 minutes per week. (*Id.*). On December 2, 2013, M.S. returned to the public school system at Old High Middle School as a fourth grader in Natalie Young's fifth and sixth grade behavior classroom. (Doc. 27-4, pp. 178-82). In Young's class, M.S. took off his shoes and climbed the cabinets when he became frustrated. (Doc. 27-4, p. 186). Young frequently sent M.S. home because of his inappropriate behavior. (Doc. 27-7, p. 192). During M.S.'s time at Old High, he never attended a full day. (Doc. 27-1, p. 211). On January 13, 2014, Janice Christy, a certified psychological examiner, completed an existing data review of M.S. (Doc. 27-1, p. 208; Doc. 27-9, p. 212). Christy concluded that M.S. had autism. (Doc. 27-

Highlights of Changes from DSM-IV-TR to DSM-V, pp. 1–2, *available for download at* https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM_Changes_ from_DSM-IV-TR_-to_DSM-5.pdf (last accessed Jan. 16, 2019).

1, p. 208).  On January 14, 2014, Maureen Bradshaw, a special education staff member at BSD, completed an Autism Diagnostic Observation Schedule-2 exam and determined that the results showed that M.S. met the classification for Autism Spectrum Disorder.  (Doc. 27-9, p. 222).

On February 11, 2014, M.S.'s IEP team met to review M.S.'s educational placement. Because of M.S.'s poor transition from the TDT, the IEP team opted to reduce M.S.'s minutes at Old High to 240 minutes per week.  (Doc. 27-9, p. 32).  This adjustment to M.S.'s IEP programming did not prove successful.  On March 17, 2014, the IEP team opted to move M.S. to Bright Field Middle School's autism classroom for 240 minutes per week.  (Doc. 27-9, p. 37). M.S. started at Bright Field Middle on March 18, 2014 in Maeghan Cavener's autism classroom. (Doc. 27-2, p. 67; Doc. 27-9, p. 47).  The IEP team met for M.S.'s annual review on May 1, 2014. Smith was pleased with M.S.'s progress.  The IEP team found that M.S. was progressing socially, academically, and behaviorally.  (Doc. 27-9, p. 49).  The team determined that M.S. was not in need of Extended Year Services.  (*Id.*).  However, over the summer between M.S.'s fourth and fifth grade year, Smith reported to the school that she was concerned M.S.'s aggressive and inappropriate behaviors were increasing.  (Doc. 27-8, p. 201).

In fifth grade, Melanie Monjure was M.S.'s core special education teacher.  (Doc. 27-4, p. 8).  Monjure has a bachelor's degree in severe/profound emotionally disturbed and autism for preschool through twelfth grade.  (*Id.* at 7).  Monjure taught M.S. and five to six other students in a self-contained academic classroom, with assistance from a paraprofessional.  (Doc. 27-4, p. 8).

On September 18, 2014, M.S.'s IEP team completed an existing data review and determined that additional data was needed regarding M.S.'s social-developmental history, speech/language testing, and occupational therapy testing.  The team also wanted an updated functional behavior assessment.  (Doc. 27-8, p. 195).  M.S.'s hearing and vision was tested on

September 18, 2014. (Doc. 27-12, p. 164). An occupational therapy reevaluation for M.S. was completed on October 6, 2014. (Doc. 31-3). M.S.'s pragmatic skills were assessed October 8, 2014 (Doc. 27-10, pp. 22-23) and M.S.'s functional behavior assessment was completed by Monjure based on observations, parent-teacher interviews, and various assessments occurring between September 10, 2014 and October 20, 2014. (Doc. 27-8, pp. 204-11).

On October 28, 2014, the IEP team met to review and discuss the results of M.S.'s functional behavior assessment and reevaluations. As a result of the additional data, although his diagnosis of Autism Spectrum Disorder remained in place, the IEP team changed M.S.'s primary handicapping condition from autism to emotional disturbance on the recommendation of school psychologist and licensed psychological examiner Keleigh Bradley. (Doc. 27-4, p. 9). Although the two conditions are very similar, Bradley believed that M.S. demonstrated more characteristics of emotional disturbance than autism in the classroom, and that directing his IEP toward addressing emotional disturbance would improve M.S.'s classroom success. (*Id.*; Doc. 27-4, p. 222).

The change in primary handicapping condition did not make a difference in terms of placement or programming for M.S. (Doc. 27-4, p. 19). During M.S.'s fifth-grade year, M.S. worked up to going to school half-a-day. (Doc. 27-4, p. 26). Monjure developed a behavior plan to deal with M.S.'s noncompliant behavior. (Doc. 27-10, pp. 131-39). Monjure's plan included giving M.S. one-on-one attention, providing rewards for completing work, creating a question "parking lot" to reduce off-task questions, and implementing a highly structured environment. (Doc. 27-4, pp. 27-31). Monjure taught M.S. to quietly ask for breaks when needed. (Doc. 27-4, p. 36). Monjure utilized project-based learning in her classroom, which allowed M.S. to have greater control over his learning. (Doc. 27-4, p. 59). Further behavioral intervention strategies Monjure applied included phrasing directions positively and refraining from redirecting M.S. once

he reached a crisis stage. (Doc. 27-4, pp. 67-71; Doc. 27-10, p. 132). Monjure took care of disciplining M.S. while he was in her class. (Doc. 27-4, p. 86). Monjure's plan was to ignore "any/all occurrences of the problem behavior and attend to the appropriate behavior of other students." (Doc. 27-10, p. 137). For crisis situations, BSD staff were to "take control of the situation by setting positive and negative limits to his behavior." (*Id.*). Once M.S. acted out and demonstrated a total loss of control, BSD staff were to "get assistance, block and move, [and] assess environment for safety." (*Id.*). Monjure also required M.S. to stay after school and complete the number of hours he was out of the classroom during breaks. (Doc. 27-6, p. 103).

The summer after M.S.'s fifth-grade year, Monjure taught summer school and M.S. attended her class. (Doc. 27-4, p. 99). Monjure wanted to ensure M.S. received a consistent schedule over the summer because another change in summer school would have been hard for him. (Doc. 27-4, p. 99). In sixth grade, M.S.'s school attendance was increased to 840 minutes of general education and 1,260 minutes of special education each week. (Doc. 27-8, p. 87). M.S. remained in Monjure's classroom. The IEP team opted to carry over the same behavior support plan for 2015-16 school year, when M.S. was in sixth grade. (Doc. 27-10, p. 140). M.S.'s inappropriate behaviors increased as his minutes in school increased. (Doc. 27-10, p. 151). However, all parties agreed that M.S. progressed behaviorally, academically, and socially during his two years at Bright Field Middle School. (Doc. 27-4, p. 165).

At the end of M.S.'s sixth-grade year, Debbie Etheridge, M.S.'s core special education teacher for the following year at Fulbright Junior High, came to M.S.'s annual review. (Doc. 27-4, p. 141). The IEP team agreed that Etheridge and Fulbright Junior High staff would implement the behavior plan Monjure employed for M.S. in fifth and sixth grade. (Doc. 27-4, p. 143). Monjure arranged for M.S. to visit Etheridge and Justin Johns, M.S.'s assigned paraprofessional

at Fulbright, during the school day to lessen the impact of transitioning to a new school in seventh grade. (Doc. 27-4, p. 142). Monjure took M.S. over to Etheridge's classroom for a week and a half at the end of his sixth-grade year. (Doc. 27-4, p. 143). Monjure expected M.S. to have some difficulty moving to a new place with a new group of people. (Doc. 27-4, p. 145). Monjure was also aware that implementing her behavior plan would be difficult in larger classrooms, even with a paraprofessional. (Doc. 27-4, pp.168-69). Smith decided that M.S. would not attend summer school between his sixth and seventh grade year because he had worked so hard to return to school full time and Monjure would not be teaching summer school that year. (Doc. 27-4, p. 146).

At Fulbright Junior High, Etheridge's classroom was a self-contained academic classroom, just as Monjure's had been. (Doc. 27-4, p. 141). Etheridge was a special education teacher with 24 years of experience. (Doc. 27-6, p. 78). Johns was assigned to M.S. to travel with him from class to class. (Doc. 27-6, p. 12). M.S. could take breaks when necessary, as he had been allowed at Bright Field Middle. (Doc. 27-6, pp. 21-22). Johns would set a timer to give M.S. a guideline for how long he should be out of the classroom. (Doc. 27-4, pp. 109-10; Doc. 27-6, p. 109). M.S. was originally instructed to use the quiet room across the hall from Etheridge's classroom that housed glider rockers, therapy balls, and an exercise machine. (Doc. 27-4, p. 105). M.S. rarely used this room though because he preferred to walk down to the office during his breaks. (*Id.*). M.S. was provided with a separate desk in classes. (Doc. 27-6, p. 13). BSD employees used positive encouragement and reinforcement when M.S. engaged in appropriate behaviors. (Doc. 27-6, p. 10; Doc. 27-6, p. 23; Doc. 27-6, p. 205).

BSD employees ignored M.S.'s disruptive behavior when it occurred in front of other students. (Doc. 27-6, p. 27; Doc. 27-6, p. 205). M.S. originally carried a behavior tracking chart to each class, but when M.S. refused to carry the chart, Etheridge permitted that refusal so they

could attempt other methods to address M.S.'s disruptive behaviors. (Doc. 27-6, p. 30; Doc. 27-6, pp. 113-15). M.S.'s teachers provided alternative work options for M.S. to allow him to take control of his learning. (Doc. 27-6, p. 19). On September 16, 2017, the IEP team updated the behavior support plan to allow a two-minute phone call with Smith when M.S. was acting inappropriately. (Doc. 27-6, p. 124).

M.S. had some notable successes during the first semester at Fulbright. M.S. was able to complete a cardboard animal project in his art class. (Doc. 27-6, p. 20). In Cynova's English class, M.S was "on task, appropriate with his answer, [and] did not become intimidated or defensive," when observed. (Doc. 27-6, p. 187).

M.S.'s violent behavior at Fulbright began on September 9, 2016, when M.S. yelled "what the hell, fuck," called classmates "retards" and "autistic" and told Palmer, the art teacher, that his mother was going to beat her up. (Doc. 27-10, p. 67). On September 12, 2016, M.S. threw a fit in class and began cussing at the teachers and students. M.S. announced that he was going to destroy the classroom. (Doc. 27-10, p. 65). This episode led to a meeting between Smith and Fulbright Principal Bradley Webber, Assistant Principal Bryan Appleton, Assistant Principal Ruth Canard, and School Resource Officer Corporal Carlson. Smith told the attendees at that meeting that any violent threat made by M.S. should be taken seriously. (Doc. 27-5, p. 31; Doc. 27-10, p. 65). Smith told the group that if M.S. threatens to hurt a person, he will do it. (Doc. 25-5, p. 31). Smith further instructed the school that school employees need to leave him alone and let him do what he wants. (Doc. 27-5, p. 31).

On September 13, 2016, M.S. was removed from class after becoming upset and throwing chairs while screaming "fuck this class." (Doc. 27-10, p. 64). On September 14, 2016, when M.S. was informed that he would have a day of in-school suspension for his outburst, M.S. became irate

and walked outside. Appleton followed him to prevent M.S. from leaving campus. (Doc. 27-10, p. 64). When Appleton attempted to speak with M.S. to calm him down, M.S. told Appleton, "don't talk to me or I will cut your throat." (*Id.*). As a result of this incident, Appleton called Smith and suggested that she take M.S. to Vantage Point for an assessment. Appleton also explained to Smith that M.S. was to be suspended for 10 days, pending an expulsion hearing. (*Id.*).

After M.S.'s threat, a manifestation determination review[2] was scheduled for September 16, 2016. (Doc. 27-5, p. 197). The IEP team did not believe the threats were manifestations of M.S.'s disability. (Doc. 27-6, p. 186). However, rather than proceeding with the manifestation determination review, BSD special education staff determined that expulsion would be improper before the team received additional testing and evaluation of M.S. (Doc. 27-5, p. 220; Doc. 27-6, p. 121). Appleton wanted a reevaluation and a rewriting of the behavior plan. (Doc. 27-5, p. 243). On October 19, 2016, the IEP team met and decided to place M.S. on half days. (Doc. 27-5, p. 251). This option was suggested based on data collected by Etheridge and the special education staff demonstrating that M.S.'s inappropriate behaviors occurred most frequently in the afternoons. (Doc. 27-5, p. 252). Specifically, M.S. would exit the classroom more often in the afternoons. (Doc. 27-6, p. 92). The plan was to move M.S. to half days for a two-week trial period to allow M.S. to have a positive experience at school for a few days before building his minutes back up. (Doc. 27-6, p. 140). This technique had been utilized by Monjure to successfully work M.S. up to attending full days at Bright Field. The two-week period was not specifically stated in

---

[2] A manifestation determination review is required by IDEA when a school district recommends change of placement for a student on an IEP because of a code of conduct violation. 34 C.F.R. § 300.530(e)(1). The review's purpose is to determine if the behavior necessitating the change in placement is a manifestation of the student's disability. (*Id.*). If the behavior is determined to be a manifestation of the student's disability, the student's behavioral intervention plan is modified, and the child is returned to their previous placement unless the school district and parent agree otherwise. (*Id.*).

M.S.'s IEP paperwork.  M.S.'s suspension was subsequently reduced from ten days to three days.  (Doc. 27-5, p. 232).

Smith was offered the plan to reduce M.S.'s time at school to half days for two weeks at an IEP meeting.  (Doc. 27-5, p. 234).  However, Smith refused to sign the plan and stated that she was going to contact her lawyer.  (Doc. 27-5, p. 273).  Appleton attempted to coordinate a meeting with Jocelyn Davis, BSD's Junior High Special Needs Coordinator, and Smith on October 20, 2016.  Smith agreed to meet, but did not show up for the meeting.  (Doc. 27-5, p. 276).  Turnage, BSD's transportation coordinator contacted Smith to discuss M.S.'s half-day transportation and Smith told him that M.S. would be there all day.  (Doc. 27-5, p. 276).  Appleton attempted to contact Smith about the problem, but Smith refused to speak with Appleton.  (Doc. 27-5, p. 277).  On October 26, 2016, Smith filed her due process action effectively staying M.S.'s placement.  (Doc. 27-5, p. 288).  After Smith filed the due process action, M.S. was suspended once and received multiple juvenile charges for further inappropriate behaviors at the school during the remaining fall semester.  (Doc. 27-5, p. 288).

M.S.'s behavior improved during the Spring semester of his seventh-grade year.  (Doc. 27-6, p. 91).  This change was the result of Smith and Etheridge putting in place a system that required M.S. to work online at home for the number of hours he is out of the classroom during school time.  (Doc. 26-7, p. 168).

III.    **Analysis**

BSD asks the Court to review findings by the Arkansas Department of Education hearing officer that BSD violated IDEA procedural and substantive requirements.  BSD argues that the hearing officer incorrectly found for Smith on three of her claims, that BSD: (1) failed to conduct complete and individualized evaluations of M.S.; (2) failed to include appropriate content in M.S.'s

IEP; and (3) failed to ensure that M.S.'s IEP was implemented as written. In particular, the hearing officer found that BSD failed to conduct complete and individualized evaluations of M.S. at the beginning of M.S.'s fifth-grade year in the fall of 2014, when BSD changed M.S.'s primary handicapping condition from Autism Spectrum Disorder to Emotional Disturbance without sufficient evaluation data, and as a result, the IEP did not adequately address M.S.'s needs as an autistic student. The hearing officer also found that BSD failed to implement M.S.'s IEP as written during his seventh-grade year in the fall of 2016 because the IEP was not written for a student whose primary handicapping condition was autism.

### A.     Statute of Limitations

As an initial matter, the Court affirms the administrative hearing officer's determination that the two-year statute of limitations allowed the due process hearing to reach only alleged violations occurring in the two years preceding Smith's October 24, 2016 request for a due process hearing. The IDEA has a two-year statute of limitations. *C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, Minneapolis, Minn.*, 636 F.3d 981, 989 (8th Cir. 2011). The statute requires "[a] parent or agency [to] request an impartial due process hearing within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint . . . ." 20 U.S.C. § 1415(f)(3)(C). Alleged violations resulting from incidents outside of the two-year statute of limitations are not actionable, unless the parent was prevented from requesting a hearing due to: 1) the parent receiving "specific misrepresentations by the local education agency that it had resolved the problem forming the basis of the complaint;" or 2) "the local educational agency[] with[eld] . . . information from the parent . . . required . . . to be provided to the parent." *Id.* at § 1415(f)(3)(D)(i-ii).

Smith presented six days of testimony detailing M.S.'s experience in BSD from M.S.'s entry in BSD in 2007 until M.S.'s seventh-grade year in 2017. Throughout the hundreds of pages of transcript, there is no evidence to support the assertion that the district interfered with Smith's ability to request a due process hearing. Smith was present at all of M.S.'s IEP team meetings, agreeing with every change until the fall of 2016, and was in constant contact with BSD employees. The hearing officer's decision correctly notes that "there was no evidence or testimony that the District misled or interfered with [Smith's] due process rights prior to the filing of the current complaint." (Doc. 10-1, p. 37). Because Smith requested her IDEA due process hearing on October 24, 2016, review is limited to the two years prior to that request.

**B.     Free Appropriate Public Education Framework**

In reviewing whether BSD's actions amounted to a violation of the IDEA, the Court must employ a two-prong analysis as outlined by the Eighth Circuit. The first inquiry is whether the school complied with the procedures set forth in the IDEA. *K.E. ex rel. K.E,* 647 F.3d at 804. Second, the Court must decide whether the resulting IEP was "reasonably calculated to enable the child to receive educational benefit." *Id.* (citations omitted). "If these requirements are met, the [school district] has complied with the obligations imposed by Congress and the courts can require no more." *Id.*

**1.     Conducting Complete and Individualized Evaluations to Change a Student's Handicapping Disability**

BSD argues that the hearing officer erred in finding that BSD violated IDEA requirements when it changed M.S.'s primary handicapping condition in the fall of 2014 without complete and individualized evaluations.

The IDEA required M.S.'s IEP Team to periodically, and at least annually, revise M.S.'s IEP to address: 1) any lack of expected progress towards annual goals; 2) the results of any

reevaluation conducted; 3) information about the child provided to or by the parents; 4) the child's anticipated needs; or 5) other matters. 20 U.S.C. § 1414(d)(4). The IDEA also required BSD to reevaluate M.S. if BSD determined that his needs, academic improvement, or functional performance warranted a reevaluation. 20 U.S.C. § 1414(a)(2).

M.S.'s IEP team completed an existing data review on September 18, 2014, and determined that the team needed to update M.S.'s social-developmental history, speech/language testing, occupational therapy testing, and functional behavior assessment. (Doc. 27-8, p. 195). M.S.'s hearing and vision were tested on September 18, 2014. (Doc. 27-12, p. 164). M.S.'s occupational therapy reevaluation was completed on October 6, 2014. (Doc. 31-3). M.S.'s pragmatic skills were assessed on October 8, 2014 (Doc. 27-10, pp. 22-23) and M.S.'s functional behavior assessment was completed by Monjure, M.S.'s fifth grade core special education teacher, based on observations, parent teacher interviews, and various assessments occurring between September 10, 2014 and October 20, 2014. (Doc. 27-8, pp. 204-11). After reviewing these assessments, Bradley, the school psychologist, believed that M.S.'s educational needs would be better met if his IEP addressed a primary handicapping condition of emotional disturbance, rather than autism. (Doc. 27-4, p. 222).

On October 28, 2014, the IEP team met to review and discuss the results of M.S.'s functional behavior assessment and reevaluations. Based on the updated evaluations and data and Bradley's recommendation, the IEP team changed M.S.'s primary handicapping condition from autism to emotional disturbance. (Doc. 27-4, p. 9). Smith signed off on this change. (Doc. 27-12, pp. 161-165).

The IEP team decided to revise M.S.'s IEP when it believed that the more appropriate primary handicapping condition for M.S. in the school setting was emotional disturbance rather

than autism. The IEP team determined that an IEP revision would allow BSD to better address M.S.'s needs when making programming decisions. Notably, the change did not disregard or override M.S.'s Autism Spectrum Disorder diagnosis, and resulted in little substantive change to the education he received. Rather, it reflected an attempt to better address M.S.'s behavioral issues. The evidence shows that BSD satisfied the IDEA's requirements for reevaluation and revision, and the administrative hearing officer erred in determining BSD violated the IDEA by failing to conduct complete and individualized evaluations of M.S.

## 2. Including Appropriate Content in the IEP

BSD also argues that the hearing officer erred in finding that BSD failed to include appropriate content in M.S.'s seventh-grade IEP. The hearing officer found that the seventh grade IEP did not include appropriate content because it was not written under the "guidelines of seeing the Student as an individual with the primary disability of autism . . . ." (Doc. 10-1, p. 40). Because the hearing officer erred when he determined that BSD's change to M.S.'s primary handicapping condition in his fifth-grade IEP violated the IDEA, and by extension that maintaining that condition through the seventh-grade IEP was erroneous, this finding—which is dependent upon that one—was also erroneous.

Ultimately, because BSD continued to provide a FAPE for M.S.'s diagnosis of Autism Spectrum Disorder, the primary handicapping condition of emotional disturbance did not change the educational benefits M.S. received, but only allowed BSD to better address instances of M.S.'s behavior, it was error for the administrative hearing officer to find that the IEP lacked appropriate content. *Accord Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S.*, 641 F.3d 996, 1004 (8th Cir. 2011) ("Given the IDEA's strong emphasis on identifying a disabled child's specific needs and addressing them, . . . the particular disability diagnosis affixed to a child in an IEP will, in many

cases, be substantively immaterial because the IEP will be tailored to the child's specific needs. . . . [T]he party challenging the IEP must show that the failure to include a proper disability diagnosis 'compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.''); *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 814 (8th Cir. 2011) ("A school district is not required to identify a student's issues by name or official diagnosis so long as the IEP properly identifies and addresses the student's disability."). M.S. progressed behaviorally, academically, and socially following the fifth-grade change to primary handicapping condition in his IEP, and it was error to find that change violated the IDEA. The evidence from the administrative record demonstrates that the IEP team decided to change M.S.'s handicapping condition from autism to emotional disturbance on October 28, 2014. After making this change, Monjure crafted a behavior support plan for M.S. based upon existing data, observations and a functional behavioral assessment. Monjure noted that presenting symptoms for autism and emotional disturbance are very similar and the change in diagnosis did not alter M.S.'s educational programming. Monjure utilized this plan in her classroom for M.S.'s fifth and sixth grade years. Monjure's behavioral supports, employed after the change in handicapping condition, allowed M.S. to succeed socially, behaviorally and academically during his fifth and sixth grade years. The IEP team opted to carry forward the programming and behavior plan developed by Monjure for M.S. during his seventh-grade year. Thus, the handicapping condition change appears to have had no effect on the unique content set forth in the IEP to accommodate M.S.'s unique needs. The content set forth in the IEPs over the three-year period was largely the same and was uniquely tailored to meet M.S.'s needs. Thus, the hearing officer erred in finding that BSD violated the IDEA by failing to include appropriate content in M.S.'s IEP. Given that M.S.'s behavior

18

worsened upon his transition to seventh-grade, it was also error to find that BSD violated the IDEA in attempting to revise the IEP to address M.S.'s misbehavior without changing the primary handicapping condition back to autism.

Even had the administrative hearing officer not erred in finding the change to primary handicapping condition in the fifth grade was an IDEA violation, when the proposed seventh-grade IEP is reviewed independently, it would be error to find BSD violated the IDEA. To satisfy the procedural requirements of the IDEA, a student's IEP should include: 1) a statement of the child's present levels of academic achievement and functional performance; 2) a statement of measurable annual goals designed to meet the child's needs; 3) a statement of the special education and related services and supplementary aids and services, as well as program modifications or supports for school personnel that will be provided; 4) an explanation of the extent to which the child will not participate with nondisabled children in class and other activities; 5) a statement of individual appropriate accommodations that are necessary to measure academic achievement and functional performance of the child on State and districtwide assessments; and 6) the projected date for the beginning of serves and modifications.  20 U.S.C. § 1414(d).  The IDEA also requires the IEP team to "consider" the use of positive behavioral interventions, supports, and other strategies to address the student's behavior, when a student's behavior impedes their learning.  34 C.F.R. § 300.324 (2017).  Each of the six procedural requirements are met in M.S.'s seventh grade IEP.

### 3.    M.S.'s IEP Not Implemented as Written

Finally, BSD argues that the hearing officer erred in determining that Fulbright Junior High employees did not follow the behavior plan as written, which resulted in a substantive violation of IDEA.    IDEA only requires that the IEP team "consider" the use of positive behavioral interventions.  *M.M. v. Dist. 0001 Lancaster Co. Sch.*, 702 F.3d 479, 487 (8th Cir. 2012).   "It is

largely irrelevant if the school district could have employed more positive behavior interventions as long as it made a *good faith effort* to help the student achieve the education goals outlined in his IEP." *Id.* The Eighth Circuit has not squarely recognized failure-to-implement claims under IDEA. *See Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1027 n. 3 (8th Cir. 2003)(citing *Houston Ind. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) as the case setting out the appropriate analysis for failure to implement claims). However, it has hinted that an appropriate standard requires the "party challenging the implementation of an IEP [to] show more than a *de minimis* failure to implement all elements of the IEP, and, instead must demonstrate that the school board or other authorities failed to implement substantial or significant portions of the IEP." *Houston Ind. Sch. Dist.*, 200 F.3d at 349. This approach is intended to "afford[] local agencies some flexibility in implementing IEP's, but still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit." *Id.* One factor to be considered in this analysis is "whether the IEP services that were provided actually conferred an educational benefit." *Id.* at 349 n. 2.

The hearing officer found that based on M.S.'s repeated inappropriate behaviors for the first three months of school, Fulbright Junior High elected not to implement or follow M.S.'s behavior support plan. However, this is not supported by a preponderance of the evidence. Fulbright Junior High employed much of the behavior plan Monjure utilized during the successful fifth and sixth grade years. Specifically, Etheridge implemented a system of allowing M.S. to exit the room when he needed a break. She used Johns, M.S.'s personal behavior paraprofessional, to monitor the time M.S. spent in the hallway or in one of the areas designated in M.S.'s behavior support plan. Etheridge ensured M.S. had a separate desk in the class where he requested one. Etheridge and Palmer both received feedback from Maureen Bradshaw about research-based

strategies that may be effective in improving M.S.'s behavior. The teachers attempted to utilize positive redirection and cooling off periods to re-engage M.S. in classroom learning. As a result, M.S. was able to achieve some success in English, Art, and PE at Fulbright.

Smith makes much of the incident that led to M.S.'s suspension and potential expulsion because Appleton did not allow M.S. appropriate time to cool off. However, Appleton was attempting to use positive redirection to prevent M.S. from leaving the school grounds, a potential safety hazard for M.S. This action by Appleton is in line with the crisis plan strategy in M.S.'s behavior plan. The strategy directs BSD employees to "block and move and assess the environment for safety" when M.S. is out of control and acts out. IDEA does not require that the school strictly adhere to behavior plans when adhering to such a plan would result in a danger to the student or his peers, and M.S.'s IEP did not require BSD to allow M.S. to leave school grounds. Each strategy in a behavior plan must be flexible and schools must have some leeway in determining when to apply certain interventions.

The hearing officer's finding that BSD did not implement M.S.'s IEP as written was erroneous. M.S.'s inappropriate behaviors did spike during the first few months of his transition from Bright Field to Fulbright, and BSD did not follow M.S.'s behavior plan exactly as written. However, Smith has not demonstrated that BSD failed to implement substantial portions of M.S.'s IEP. To the contrary, the evidence throughout the administrative record reflects that Etheridge, Palmer, Cynova, and Appleton all made good faith efforts to consider and rely upon behavior plan support strategies when possible. Although these strategies only yielded minimal success from August to October of 2017, the record does not support the finding that BSD employees did not attempt to implement the strategies as written.

## IV.    CONCLUSION

THE COURT FINDS that the administrative hearing officer erred in finding that BSD failed to conduct complete and individualized evaluations, failed to include appropriate content in the IEP, and failed to ensure that M.S.'s IEP was implemented as written.

IT IS THEREFORE ORDERED that the findings of the administrative hearing officer in Smith's favor are reversed, and that judgment on the pleadings be entered in BSD's favor.

Judgment will be entered separately.

IT IS SO ORDERED this 23rd day of January, 2019.

/s/ P. K. Holmes, III

P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE